-O-

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA QUINTANAR, on behalf of J.N., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. ASTRUE, Commissioner of Social Security, <br><br> Defendant. | Case No. EDCV 09-970-OP <br><br> MEMORANDUM OPINION; ORDER |

The Court[1] now rules as follows with respect to the disputed issues listed in the Joint Stipulation ("JS").[2]

///
///
///

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the United States Magistrate Judge in the current action. (See Dkt. Nos. 11, 13, 16.)

[2] As the Court stated in its Case Management Order, the decision in this case is made on the basis of the pleadings, the Administrative Record, and the Joint Stipulation filed by the parties. In accordance with Rule 12(c) of the Federal Rules of Civil Procedure, the Court has determined which party is entitled to judgment under the standards set forth in 42 U.S.C. § 405(g).

1

# I.
# DISPUTED ISSUES

As reflected in the Joint Stipulation, the disputed issues which Plaintiff[3] raises as the grounds for reversal and/or remand are as follows:

1. Whether the Administrative Law Judge ("ALJ") properly considered the lay witness's testimony;
2. Whether the ALJ properly considered the examining psychologist's opinion;
3. Whether the ALJ properly considered the teachers' questionnaires;
4. Whether the ALJ properly considered the treating psychiatrist's opinion; and
5. Whether the ALJ properly considered the speech pathologists' speech and language reports.

(JS at 3.)

# II.
# STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (citation omitted). The Court must review the record as a whole and consider adverse as well as

---

[3] Cynthia Quintanar ("Plaintiff") is the mother of J.N.

supporting evidence. Green v. Heckler, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984).

## III.

## DISCUSSION

**A.     The ALJ's Findings.**

Plaintiff, on behalf of her son, J.N., a 10 year-old male, brings this action appealing a denial of Supplemental Security Income ("SSI") benefits. Plaintiff asserts an onset date of disability of January 27, 2005, due to attention deficit hyperactivity disorder ("ADHD"), learning disorder, anxiety disorder, and asthma. (JS at 2.)

After an August 16, 2007, hearing (see Administrative Record ("AR") at 564-80), the ALJ issued an unfavorable decision (id. at 10-23). After the Appeals Council denied review, Plaintiff filed a civil action in this Court, EDCV 08-447-OP. On September 26, 2008, this Court issued an order of remand based on the parties' Stipulation to Voluntary Remand. On October 15, 2008, the Appeals Council vacated the decision and remanded the case for further proceedings. (Id. at 613-14.)

On February 17, 2009, a subsequent hearing was held before the same ALJ. (Id. at 618-32.) On March 13, 2009, the ALJ issued his decision, finding that J.N. had the severe impairments of ADHD, combined type; learning disorder in basic reading skills and math calculation; anxiety disorder, not otherwise specified; asthma; and obstructive sleep apnea. (Id. at 587.) The ALJ found that J.N. did not have an impairment or combination of impairments that met or equaled a listing, and, therefore, was not disabled. (Id. at 587-88, 597.)

/ / /

/ / /

**B.     Lay Witness Testimony.**

Plaintiff contends there is no indication in the decision whether the ALJ considered her hearing testimony, and that the ALJ failed to provide germane reasons for rejecting her testimony. (JS at 3-4.) She contends this testimony lends support to J.N.'s difficulty in attending and completing tasks. (Id. at 4.)

Specifically, at the hearing, Plaintiff testified that J.N. gets "very easily distracted" and does not follow through with chores. (AR at 624-25.) She stated that J.N. takes out the trash, but that "[h]e doesn't seem to comprehend . . . which receptacle to put it in." (Id. at 625.) With regard to schoolwork, Plaintiff testified that she has someone who assists J.N. with his homework, and that if J.N. is left alone, he will not follow through. (Id. at 626.) She testified that J.N. has been cited for fighting and disrupting the classroom. (Id. at 630-31.) She testified that J.N.'s grades have declined and that, "[h]e was getting B's and now it's fallen down . . . to a C, and he was in danger of failing spelling." (Id. at 631.)

While an ALJ may choose to reject testimony from lay witnesses, he may not do so without comment. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). When rejecting lay witness testimony, the ALJ must provide reasons that are germane to each witness. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001); Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

In his October 25, 2007, decision, the ALJ did discuss Plaintiff's testimony,[4] finding that although she appeared sincere, her testimony was not fully credible "regarding the extent, intensity and duration of the alleged subjective symptoms and functional limitations and restrictions." (AR at 18.) Specifically, he noted that her testimony regarding J.N.'s asthma flaring up once a month and requiring multiple medications, was inconsistent with the opinion of the medical expert, Colin P. Hubbard, M.D., who found that there were multiple encounters in the file

---

[4] (See AR at 564-80.)

in which J.N.'s lungs were noted to be clear and that J.N.'s symptoms were well-controlled with medication. (Id. at 18 (citing id. at 561-62, 577).) Conflicts between the lay witness testimony and the medical evidence may be a valid reason for discounting the credibility of lay witness testimony. See, e.g., Lewis, 236 F.3d at 511-12.

The ALJ also noted that Plaintiff's testimony was self-contradictory. (AR at 18.) For instance, she testified J.N. could not sit still (id. at 568), but then testified he liked to sit and watch sports on television (id. at 578); she testified he had slow motor skills (id. at 576), but also testified he loved sports activities, and played basketball and little league baseball (id. at 578); she testified he had behavioral issues, but also testified he got along well with siblings and playmates (id. at 570); she also testified that his medications helped him (id. at 575). The fact that a witness has made contradictory or inconsistent statements may also be a germane reason for discounting that witness's testimony. Lewis, 236 F.3d at 512; Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).

At the subsequent hearing, the ALJ informed Plaintiff that her prior testimony and evidence remained a part of the record. (AR at 621.) At that subsequent hearing, Plaintiff testified that J.N.'s symptoms had not worsened (id. at 623); he was quite social and had no problems playing with other kids (id. at 628-29); he had no discipline problems when playing school sports (id. at 629); he had no significant behavioral problems (id. at 631); he was receiving "B's" and "C's" in school (id.); and his treatment regimen was effective in treating his asthma, and he had no hospitalizations (id.).

In the March 13, 2009, decision, the ALJ noted that "except to the extent that it [was] specifically modified" by his updated findings, he was incorporating by reference his October 25, 2007, summary of the medical and non-medical evidence. (Id. at 588.) Thus, his evaluation of Plaintiff's prior testimony was incorporated by reference, and there was no error in failing to specifically refer to

5

it again in the later decision.

Based on the foregoing, the Court finds that the ALJ provided sufficient reasons germane to the witness for giving her statements less weight. Thus, there was no error.

**C.   Examining Psychologist's Opinion.**

Plaintiff contends the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence, to implicitly reject certain findings of Robert Soikkeli, Psy.D., an examining psychologist who completed a Psycho-Educational Report (id. at 69-77) based on three separate observations that took place on January 31, 2005, February 3, 2005, and February 12, 2005, as well as on a battery of tests he administered to J.N.[5]  (JS at 8-9.)

Specifically, based on his testing and observations, Dr. Soikkeli noted that J.N. had "some difficulties" with perceptual motor skills (AR at 75); his manual dexterity was an "area of weakness" (id.); he had "very significant" delays in understanding and remembering basic sounds and shapes (id. at 76); he had "processing deficits" in the areas of attention and sensory motor integration (id.); he had a "severe discrepancy" between academic performance and cognitive abilities in the area of basic reading and math skills, and, therefore, he appeared to qualify for special education services for a specific learning disability (id.).

---

[5] In childhood disability cases, the ALJ must determine whether the child's impairments functionally equal a listing by assessing the degree of limitation in six functional domains.  20 C.F.R. § 416.926a(a).  The six domains are: (1) Acquiring and using information; (2) Attending and completing tasks; (3) Interacting and relating with others; (4) Moving about and manipulating objects; (5) Caring for oneself; and (6) Health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  Under this analysis of functional equivalence, the ALJ cannot find the claimant disabled unless the impairments resulted in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(d).

Plaintiff contends that the ALJ noted only Dr. Soikkeli's findings that J.N. had no classroom behavior problems, took turns appropriately, and followed his teacher's instructions.  (Id. at 594.)  As a result, Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for implicitly rejecting Dr. Soikkeli's additional findings of "significant limitations in [the domains of] acquiring and using information and . . . the ability to manipulate objects.  (JS at 8.)  The Court disagrees.

Plaintiff's contentions fail because the ALJ thoroughly and properly considered Dr. Soikkeli's findings.  For instance, the ALJ noted that his finding that J.N. had less than marked limitations in acquiring and using information was consistent with Dr. Soikkeli's testing, which had found scores of achievement well above the second percentile, and cognitive function in the average range.  (AR at 592 (citing id. at 75-76).)  In the domain of attending to and completing tasks, the ALJ noted that his "less than marked" finding comported with Dr. Soikkeli's observation that J.N. transitioned well from "cutting paper objects . . . to working on letters and the sounds of letters," and was able to take turns appropriately and follow instructions.[6]  (Id. at 593 (citing id. at 69).)  In the domain of interacting and relating with others, the ALJ found no limitations and explained that Dr. Soikkeli observed J.N. interacting well with other children, taking turns appropriately, and following the teacher's instructions, and that Dr. Soikkeli opined that J.N. did not exhibit behavioral problems.[7]  (Id. at 593-94 (citing id. at

---

[6] This was consistent with Dr. Pierce's testing that showed J.N's concentration and attention span were "subjectively fair" but objectively strong, in the "top, high average range."  (AR at 294.)  Medical treatment notes also indicated consistent improvement.  (Id. at 528.)

[7] The ALJ also based this finding on a February 2005 evaluation by J.N's teacher indicating he had no problems in this area (AR at 64); J.N. had received
(continued...)

69-71.) In the domain of manipulating objects, the ALJ noted Dr. Soikkeli's opinion that J.N. had age appropriate fine and gross motor skills, and found that Dr. Soikkeli's opinion was consistent with Dr. Valenzuela's examination that found fine and general motor skills within the "normal range," as well as with a motor skills test administered by the school when J.N. was six. (Id. at 594-95 (citing id. at 70, 323-24, 451).)

The ALJ also noted Dr. Soikkeli's opinion that J.N. was qualified for special education services because of J.N.'s processing deficits in attention and sensory motor skills, and a discrepancy between intellectual ability and achievement in basic reading and math calculation skills. (Id. at 588 (citing id. at 76.) The ALJ's findings of a learning disability is consistent with Dr. Soikkeli's opinion.

The ALJ's findings that J.N.'s limitations in the six domains were no worse than "less than marked," i.e., impliedly somewhat more than moderate, are not inconsistent with any of Dr. Soikkeli's opinions. Moreover, as of April 2007, treatment notes indicated J.N. had consistently reported improvement with his medications such that he "denied school problems and he even received awards at school." (Id. at 592.) Based at least in part on Dr. Soikkeli's opinions as well as other substantial evidence of record,[8] the ALJ found that J.N. had a learning

---

[7](...continued)
citizenship awards in school (id. at 528); and was described by his mother as getting along well with family and friends (id. at 293).

[8] The ALJ also discussed treatment records from J.N.'s treating physician, Eugene Young, D.O., indicating that J.N's attention deficit symptoms were under control (AR at 588, 590 (citing id. at 528-53), Carolyne Lim, M.D., finding that Plaintiff's asthma was under control (id. at 588, 590 (citing id. at 487, 498), and other treatment records indicating that J.N. was having a "good response" to his medications (see, e.g., id. at 540). The ALJ also discussed the opinions of
(continued...)

disability and ADHD, findings consistent with Dr. Soikkeli's opinions.

Based on the foregoing, the Court finds that the ALJ's decision was not inconsistent with Dr. Soikkeli's findings. Thus, there was no need to provide specific and legitimate reasons for rejecting an opinion that was not, in fact, rejected.

**D.   Teachers' Questionnaires.**

Plaintiff contends the ALJ improperly discredited the statements made by J.N.'s teachers, Ms. Gould, and Ms. Welchey, without providing reasons germane to the witnesses. (JS at 15-17.) Specifically, he claims the ALJ considered only aspects of the questionnaires favorable to his decision, and disregarded, without explanation, relevant limitations in acquiring and using information, attending and completing tasks, moving about and manipulating objects, and caring for himself. (Id.)

     **1.   The Questionnaires.**

          **a.   Ms. Gould's Questionnaire.**

On March 5, 2005, Ms. Gould, J.N.'s kindergarten teacher, completed a Teacher Questionnaire form. (AR at 61-68.) She reported that J.N. was below basic instructional levels in the areas of reading, math, and written language. (Id. at 61.) She rated him as having "[a]n obvious problem" with respect to

---

[8](...continued)
examining psychologist, Mark Pierce, Ph.D., who opined that J.N. was in the average range of intellectual functioning (id. at 291-97, 327-33); examining pediatric physician, Efren Valenzuela, M.D., who opined that J.N. had no gross functional limitations (id. at 322-25, 589-90); and the concurring opinions of the reviewing physicians, G. Johnson, M.D. (id. at 300-11), and Mark G. Salib, M.D. (id. at 312-20). The ALJ also gave great weight to the opinion of the medical expert, Dr. Hubbard (id. at 587), who reviewed J.N's longitudinal medical history and offered an opinion, consistent with the evidence, that J.N. had "no marked or extreme limitations in any of the six domains" (id. at 561-63).

understanding oral instructions, participating in discussions, providing organized oral explanations, and learning new material; a "serious problem" with respect to expressing ideas in written form; and a "very serious problem" in reading and comprehending written material, comprehending and doing math problems, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (Id. at 62.) She also reported J.N. had "a terrible time paying attention" (id.); a serious problem focusing long enough to finish assigned tasks; a very serious problem carrying out multi-step instructions, working without distracting self or others, and working at a reasonable pace (id. at 63). She stated he is not independent in his work and requires redirection three times within a ten minute time period, although he is "positively receptive of correction." (Id.) Ms. Gould rated J.N. as having a serious problem with moving and manipulating things, and demonstrating strength, coordination, and dexterity in activities or tasks. (Id. at 65.) She stated, "[J. N.] is still having trouble with his writing." (Id.) She also rated J.N. as having a serious problem with identifying and appropriately asserting his emotional needs, and a very serious problem with responding to changes in his own mood and knowing when to ask for help. (Id. at 66.)

    **b.**   **Ms. Welchey's Questionnaire.**

On November 18, 2005, Rachel C. Welchey, J.N.'s first grade teacher, completed a Teacher Questionnaire. (Id. at 144-152.) Ms. Welchey stated that she had known J.N. for three months and spent five days a week, six hours per day, with him. (Id. at 144.) She identified J.N. as being in the first grade, but noted that his current instruction levels in reading and written language were at the pre-kindergarten level and his current math level was at the kindergarten level. (Id.) Ms. Welchey also rated J.N. as having an obvious problem to a very serious problem in acquiring and using information. (Id. at 146.) She stated, "[J. N.] gets very anxious and will give answers that make absolutely no sense. He takes

longer to do these activities and is always working [with a] peer buddy or the teacher one on one." (Id.) In addition, Ms. Welchey rated J.N. as having an obvious problem to a very serious problem in the areas of attending and completing tasks. (Id. at 147.) Ms. Welchey stated, "I give him many verbal and visual prompts to redirect him throughout daily activities. His lack of completion of tasks is not due to disobedience, but lack of attention." (Id.) In the area of caring for himself, Ms. Welchey rated J.N. as having an obvious problem with being patient when necessary and using appropriate skills to meet daily demands of school environment, and a serious problem with handling frustration appropriately, identifying and appropriately assessing emotional needs, and responding appropriately to changes in his mood. (Id. at 150.) She stated, "[J. N.] gets very anxious and has difficulty controlling emotions when he can't express his idea or need to the teacher." (Id.)

### 2. Analysis.

As previously discussed, lay testimony is competent evidence that an ALJ must take into account, unless the ALJ expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. Lewis, 236 F.3d at 511. In determining disability for children, the ALJ looks at information provided by teachers, parents, and school specialists. 20 C.F.R. § 416.924a(2). The testimony from such witnesses is entitled to less weight than the evidence from medical professionals and other specialists.

Plaintiff's contentions fail because the ALJ properly considered the teachers' opinions. For instance, he discussed the March 2005 indications that J.N. had a very serious problem in reading and comprehending written material, comprehending and doing math problems, recalling and applying previously learned material, and applying problem solving skills. (AR at 19.) He noted the very serious problems in carrying out instructions, working without distracting himself or others, and working at a reasonable pace. (Id. at 20.) He further noted

the teacher reported J.N.'s serious problems in strength, coordination, and dexterity in manipulating objects (id. at 21), and responding appropriately to changes in mood (id. at 22.) These findings were incorporated by reference in the later report although the ALJ also mentioned some of these findings again. (Id. at 594-96.)

The ALJ, who as previously discussed gave proper weight to Dr. Soikelli's findings, also gave germane reasons for discounting the teacher questionnaires. For example, he noted that Ms. Gould's ratings indicating serious problems with changes in mood and knowing when to ask for help, and were inconsistent with her observations that J.N. had no problems in interacting and relating with others (id. at 20), and with Dr. Soikkeli's observations that J.N. exhibited no behavior problems in class. (Id. at 20, 22.) The teacher's observations regarding strength and coordination, were inconsistent with Dr. Soikkeli's finding that J.N. demonstrated age appropriate fine and gross motor skills (id. at 21). Lewis, 236 F.3d at 512 (conflict between lay witness testimony and the medical evidence, or inconsistencies in testimony, are valid reasons for discounting the credibility of lay witness testimony).

The ALJ also considered Ms. Welchey's responses regarding J.N. exhibiting stress and anxiety. (Id. at 23, 589.) The ALJ explained that Ms. Welchey's assessment occurred prior to J.N.'s medication adjustment (id. at 23), and, thus, did not account for his later success with treatment for his ADHD (id. at 540). As explained by the ALJ, the medical evidence indicated that once J.N. began an effective medication regimen, his symptoms improved to the point that his physicians consistently indicated that he was doing better at school, including outstanding citizenship. (See, e.g., id. at 528.) J.N.'s treating physicians noted that J.N.'s medication was effective and he was improving at school. (Id. at 588 (citing id. at 414, 478, 540.) As the ALJ explained, J.N.'s mother also admitted that J.N.'s medication adjustment had been effective, and that J.N. could perform

basic mathematical calculations. (Id. at 572-73, 575.) She also testified that J.N. got along well with his sibling and playmates (id. at 570), and she had stated the same thing to the pediatric examiner (id. at 293).

Moreover, the ALJ analyzed the relevant medical evidence, including the educational records, the opinion of Dr. Soikkeli, the opinions of treating physicians Dr. Young and Dr. Lim, examining psychologist, Dr. Pierce, examining pediatrician, Dr. Valenzuela, and reviewing physicians, Dr. Johnson and Dr. Salib. He gave great weight to the opinion of the medical expert, Dr. Hubbard, who performed a thorough review of J.N.'s longitudinal medical history, and offered an opinion consistent with the evidence. (Id. at 587.) Dr. Hubbard found no marked or extreme limitations in any of the six domains. (Id. at 561-63.) Moreover, the teachers' opinions are not inconsistent with Dr. Soikkeli's findings of a possible learning disorder and need for special education, nor are they inconsistent with the ALJ's findings of ADHD and a learning disorder. (Id. at 16, 587.)

Based on the foregoing, the Court finds that substantial evidence supported the ALJ's findings, and he provided specific and legitimate reasons for discounting the teachers' findings to the extent they were inconsistent with the medical findings, or with J.N.'s improvement after having his medication adjusted.

**E.     Treating Psychiatrist's Opinion.**

On October 26, 2004, J.N. presented to San Bernardino County Department of Behavioral Health ("SBCDBH") with complaints of not paying attention, impulsivity, temper tantrums, and lagging academically, including speech problems. (Id. at 435-41.) He was referred for a psychiatric evaluation. (Id. at 436.) According to the subsequent psychiatric evaluation completed by Syeda Baig, M.D. (id. at 418-21), Plaintiff reported J.N. had a poor attention span and fair impulse control and insight. (Id. at 420.) Dr. Baig's preliminary diagnoses included developmental delay NOS (not otherwise specified), rule out ADHD, and Anxiety NOS. (Id.) Dr. Baig also assessed J.N. as having a Global Assessment of

Functioning ("GAF") score of 50.  (Id.)  A GAF score of 41-50 is indicative of "Serious symptoms OR any serious impairment in social, occupational, or school functioning."  Diagnostic and Statistical Manual of Mental Disorders-IV-TR 32 (American Psychiatric Ass'n ed., 4th ed. 2000) ("DSM-IV").  Dr. Baig recommended no medication at that time, but she did recommend parenting classes for Plaintiff because of the possible ADHD.  (AR at 421.)

Plaintiff contends the ALJ ignored Dr. Baig's psychiatric evaluation, which she claims "provides a historical background and lends support to [J.N's] impairments."  (JS at 22.)  She also claims the ALJ failed to provide specific and legitimate reasons for failing to consider that evaluation.  (Id.)

It is well established in the Ninth Circuit that a treating physician's opinion is entitled to special weight, because a treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

"The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  20 C.F.R. §§ 404.1527(d), 416.927(d).  If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996); Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).  Where a treating physician's opinion is controverted by the opinions of other physicians of record, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record.  Magallanes, 881 F.2d at 751; Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  Nor is the ALJ's obligation relieved where the treating physician has rendered an opinion on the ultimate issue of disability.  See,

e.g., Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record."); Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).

The ALJ did holistically discuss J.N.'s treatment records from SBCDBH, especially the findings of Dr. Young, J.N.'s treating physician. (AR at 590.) Dr. Young's findings included J.N.'s subsequent diagnosis with ADHD, and J.N.'s treatment plan, which included medication and children's group therapy. (Id.) Dr. Baig's later treatment notes also were consistent with the ALJ's findings. For example, at J.N.'s follow up visit with Dr. Baig on December 14, 2004, Dr. Baig noted improvement in J.N.'s behavior (id. at 417); on March 15, 2005, Dr. Baig indicated that J.N. was stable and doing better at school (id. at 414); on May 18, 2005, she indicated that although J.N. had been prescribed medication, he was doing well in school without the medication, and that J.N.'s mother had not given him his medication for the past three weeks (id. at 412). On September 19, 2005, Dr. Baig again indicated that J.N. had improved at school (id. at 413). See, e.g., Warre v. Comm'r Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2005) ("[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits") (citations omitted).

The ALJ also discussed the observations of Dr. Young, the SBCDBH physician who had a consistent treatment relationship with J.N. (AR at 590); see also 20 C.F.R. § 416.927(d)(2) (ALJ will give more weight based on length of treatment relationship, nature and extent of the relationship, consistency with objective evidence, and other factors). After a few visits with Dr. Baig, it appears J.N. transitioned to a longer-term relationship with Dr. Young. (Id. at 528-60.) The ALJ discussed Dr. Young's treatment notes. (Id. at 590 (citing id. at 528-60 ("Exhibit 6F").) He mentioned Dr. Young's observations that J.N. had responded

well to medication for his ADHD (id. at 540), was sleeping better (id. at 537), and had no major problems or side effects from his medication (id. at 535). Dr. Young also noted J.N. was doing well at school and had received some awards. (Id. at 528, 540.)

Plaintiff seems to be specifically complaining that the ALJ failed to mention the GAF score of 50 as assessed by Dr. Baig during her initial intake of J.N. (JS at 21, 25.) GAF scores reflect the "clinician's judgment of the individual's overall level of functioning and include[] psychological, social and occupational functioning" and are not meant to be a conclusive medical assessment of overall functioning, but rather, are only intended to be "useful in planning treatment[,] . . . measuring its impact, and in predicting outcome." DSM-IV 32-34. Moreover, the Social Security regulations do not require an ALJ to take the GAF score into account in determining the extent of an individual's disability; while the score may help the ALJ assess the claimant's disability, it is not essential and the ALJ's failure to rely on the GAF does not constitute an improper application of the law. Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) (while a GAF score may be of considerable help to the ALJ, it is not essential; the ALJ's failure to reference the GAF score, standing alone, does not make the ALJ's findings inaccurate). The Court is not persuaded that the ALJ's failure to mention the 2004 GAF score equates with a rejection of that opinions and finds no error.

In this case, the GAF score might have been accurate at the time it was assessed. However, the Court notes that Plaintiff does not complain that the ALJ also did not mention the GAF score of 56 reflected in an August 19, 2005, treatment note; a note that also reflected that J.N's GAF score had been 55 for the "past year." (AR at 393, 396.) A GAF score between 51 and 60 is indicative of "Moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning (e.g, few friends, conflicts with peers or co-workers). DSM-IV 34.

Nor does the score of 50 itself appear to be inconsistent with the ALJ's

findings regarding J.N.'s functioning which sufficiently accounted for J.N.'s "less than marked" limitations in the six relevant domains. Moreover, the Commissioner's regulations provide that more weight is given to longitudinal opinion evidence. 20 C.F.R. § 416.927(d)(2). Dr. Baig's GAF assessment was a "snapshot" assessment of J.N.'s condition at the point in time he presented to SBCDBH and was based primarily on Plaintiff's reports of J.N.'s behavior. Further, there is no indication that Dr. Baig did any objective testing during that visit. See 20 C.F.R. § 416.927(c)(2) (ALJ gives more weight to opinions based on objective evidence, such as tet results). Even in December 2004 Dr. Baig reported "labs not yet done" and J.N. "not on meds." (AR at 417.)

The longitudinal evidence, including later treatment records from Dr. Baig herself, indicates J.N.'s continued improvement with medication and treatment and is not inconsistent with the ALJ's findings. The ALJ properly considered all of the longitudinal evidence which indicated improvement over time and did not err in failing to specifically mention this or any other GAF score. See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (the ALJ need only discuss evidence that is significant and probative).

Based on the foregoing, the ALJ did not err in failing to specifically mention Dr. Baig's GAF score or her evaluation in his decision, and even if there was error, it was harmless. Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991) (harmless error rule applies to review of administrative decisions regarding disability).

**F.     Speech Pathologist's Report.**

On February 16, 2005, Anna-Liza Takenaka, M.A., CCC-SLP, completed a Speech And Language Report covering the assessment period of January 21, 2005, through February 4, 2005. (AR at 95-99.) During this period, Ms. Takenaka administered a battery of language tests to J.N. (Id. at 96-97.) She found he exhibited deficits in language processing and pragmatics (the social use of

language), but that syntax, articulation, voice, and fluency were all adequate for his age and developmental level. (Id. at 99.) Ms. Takenaka "recommended that the IEP team consider direct speech-language services to address [J.N.'s] language needs." (Id.)

On December 23, 2005, Janet Campbell, M.A., CCC-SLP, performed a Speech and Language Evaluation on J.N. (Id. at 177-78.) She also found J.N. had difficulty in communicating. (Id.)

Plaintiff contends the ALJ erred because he ignored these speech and language reports from accepted medical sources. (JS at 27.) The Court disagrees.

The assessment by Ms. Takenaka (AR 95-99), was incorporated by reference in Dr. Soikkeli's February 15, 2005, report. (Id. at 72 ("the speech and language assessment [was] completed as part of this evaluation").) The report did not find any greater limitation than that discussed by Dr. Soikkeli. Ms. Takenaka's assessment was conducted before J.N. started receiving treatment for ADHD. She opined that J.N. could properly understand and answer questions, use appropriate body language and gestures, notice and understand other people's body language and gestures, make inferences, and understand humor. (Id. at 99). Ms. Campbell performed an assessment and found that J.N. was "fully intelligible," could understand questions, was able to explain simple cause and effect situations, and had age-appropriate vocabulary levels. (Id. at 177-78.) Because he tended to "wander or meander verbally," she concluded that J.N. had a "[m]ild delay in receptive and expressive language." (Id. at 178). However, she specifically noted that this delay was "less than marked by a scaled score." (Id.) Ms. Campbell's report also was consistent with the ALJ's findings that J.N. had "less than marked" limitations in functioning, and therefore, was not disabled under the Social Security Act. (Id. at 597.)

Based on the foregoing, the Court finds there was no error in the ALJ's failure to specifically mention these reports and, even if there was error, it was

18

harmless. <u>Curry</u>, 925 F.2d at 1131.

## IV.
## **ORDER**

Based on the foregoing, IT THEREFORE IS ORDERED that Judgment be entered affirming the decision of the Commissioner, and dismissing this action with prejudice.

Dated: March 19, 2010

HONORABLE OSWALD PARADA
United States Magistrate Judg